NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-790

COMMONWEALTH

vs.

JOHN THOMPSON.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the Superior Court, the defendant was convicted of home invasion, in violation of G. L. c. 265, § 18C, and masked armed robbery, in violation of G. L. c. 265, § 17.  The convictions were based primarily on the testimony of an accomplice, Amanda McGadden, who testified under a grant of immunity.  On appeal, the defendant claims that McGadden's testimony was not corroborated as required by G. L. c. 233, § 20I, and therefore, the evidence was insufficient to convict him.  He also claims that he was unduly prejudiced by testimony, to which there was no objection, that he told McGadden that she should identify the culprit as a Black man.  We affirm.

Background.  We set forth the facts in the light most favorable to the Commonwealth.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  The victim was in his mid-to-late sixties and resided in an apartment in Ayer with a roommate, Arthur Osborne, when he was robbed of drugs (prescription pills) and money at gun point by a masked intruder on the evening of January 21, 2018.  Osborne was home at the time and witnessed the robbery.  He testified that shortly after 10 P.M., he was in his bedroom when he heard "high-pitched screaming."  He left his room to investigate and saw the victim and McGadden, whom he recognized as an acquaintance of the defendant and the victim, in the living room.  A man dressed in black was pointing a gun at both the victim and McGadden.  The man's back was facing Osborne and Osborne did not recognize him although he had seen the defendant visiting the victim on prior occasions.  Osborne returned to his bedroom, locked the door, and called the police, who arrived about seven to eight minutes later.  By that time, both the intruder and McGadden were gone.  Ayer police officer Brent Davis spoke with the victim, who did not identify the defendant as the intruder at that time but given the connection between the defendant and McGadden, who at that point also was viewed as a victim, Officer Davis asked for the defendant's phone number.  Officer Davis then called the

2

defendant and when the two spoke he asked for information about McGadden. The defendant said he did not know McGadden well and provided a phone number for her which turned out to be a "bogus number." Ultimately, Officer Davis located McGadden and spoke with her.

As previously noted, McGadden testified pursuant to a grant of immunity. She explained that she met the defendant through a mutual friend in October 2017. McGadden accompanied the friend to the defendant's house where the friend bought oxycodone or Percocet. Thereafter, McGadden and the defendant became friendly and McGadden would go to the defendant's house to "hang out." According to McGadden, the defendant purchased pills from the victim for himself and to sell to others. On the night of the robbery, the defendant picked up McGadden in Concord around 6 P.M., and took her to his house in Ayer. They socialized for a few hours and consumed alcohol and drugs. At a certain point, the defendant said he needed to get money that the victim owed him and so they drove to the victim's home together.[1] The defendant instructed McGadden to knock on the victim's door to see if he was home. McGadden did so and the victim invited her inside. McGadden then texted the defendant and informed him

---

[1] The defendant told McGadden that the victim was "not mentally all there" and that "he would be an easy target."

3

that the victim was home.  The defendant responded by text and asked her to confirm the back door was unlocked, which she also did.  About forty minutes later, the defendant entered the home pointing a gun at her and the victim and demanded money.  The defendant took money, pills, and McGadden's purse and then ran out the back door.

McGadden claimed she was afraid and described herself as "freaking out."  She fled from the home and called the defendant, who was down the street in his car.  McGadden joined the defendant and saw her purse on the car floor which now contained a gun.  The defendant and McGadden then drove to Leominster where the defendant bought pills with the money he had stolen from Engler.

Following the robbery, McGadden went to stay with her father on Cape Cod where Officer Davis contacted her.  After speaking with Officer Davis, McGadden called the defendant to tell him the police had reached out to her.  McGadden testified that the defendant said, "if [officers] asked what [the perpetrator] looked like, just say it was a [B]lack man."

At trial, the victim testified that the man who robbed him was John Thompson, but he could not recognize the defendant in the courtroom and did not make an in-court identification.  The victim's testimony was generally undermined by the fact he

4

suffered from delusions, often repeated himself and, as Osborne testified, told "stories that seemed a little bit farfetched."

The Commonwealth also presented testimony from a criminal intelligence analyst, Lisa Schultz, who was employed by the New England State Police Information Network. She conducted a cell phone analysis of the defendant's cell phone number on the night of the robbery. That analysis revealed that between 6 P.M. and 7 P.M., the defendant's phone was using towers in the area between Littleton and Concord. Between 8:44 P.M. and 10:39 P.M., the time preceding and during the robbery, the defendant's phone was connecting with towers in Ayer, and starting at 10:46 P.M., the defendant's phone connected with cell phone towers along Route 2, between Ayer and Leominster. This cell tower information was consistent with the defendant's travel as described by McGadden. In addition, phone records showed that between 9:54 P.M. and 10:34 P.M., eighteen text messages were exchanged between McGadden's phone and the defendant's phone and that at 10:39 P.M. there was an outgoing phone call from McGadden's phone to the defendant's phone that lasted 284 seconds.

Discussion. General laws c. 233, § 20I, provides: "[n]o defendant in any criminal proceeding shall be convicted solely on the testimony of, or the evidence produced by, a person

granted immunity under the provisions of [§ 20E]."  "The purpose of the statute is to require support for the credibility of the immunized witness.  That support may come as much in the form of corroboration of evidence of the commission of the crime as it does from proof that the defendant was a participant." Commonwealth v. Robinson, 48 Mass. App. Ct. 329, 335 (1999), quoting Commonwealth v. DeBrosky, 363 Mass. 718, 730 (1973). "The corroborating evidence need not connect the defendant to the crime, but must support at least one element of the crime." Commonwealth v. Resende, 476 Mass. 141, 152 (2017).

We conclude that the Commonwealth presented sufficient corroborating evidence to meet the requirements of the statute. Osborne testified that McGadden, whom he knew to be the defendant's friend, was present during the robbery.  McGadden's testimony also was corroborated in part by cell site location information and the call and text history between her phone and the defendant's phone before and after the robbery.  Although the victim provided confusing and conflicting testimony, to a large extent he also corroborated McGadden's testimony.  In addition, the jury could conclude that the defendant showed consciousness of guilt when he gave Officer Davis false information about his relationship with McGadden and provided him with a "bogus" phone number.  See Commonwealth v. Martinez,

6

476 Mass. 186, 197 (2017).  This evidence of consciousness of guilt further supported McGadden's claim that the defendant had committed the crimes.  In sum, contrary to the defendant's assertions, the jury was presented with sufficient evidence to corroborate McGadden's testimony about the events of the night of the shooting.

The defendant also argues that he is entitled to a new trial based on McGadden's testimony that the defendant told her "if [officers] asked what [the perpetrator] looked like, just say it was a [B]lack man."  Although the defendant did not object at trial, he now argues that this comment had "no probative value" and "only served to cast [him] in a poor light."  We discern no error let alone a substantial risk of miscarriage of justice.  See Commonwealth v. Randolph, 438 Mass. 290, 297 (2002) (unpreserved errors are reviewed to determine if they created substantial risk of miscarriage of justice).  The comment was probative of the defendant's consciousness of guilt as it reflected an attempt to mislead the officers by deflecting suspicion away from him.  See Commonwealth v. Vick, 454 Mass. 418, 424-426 (2009).  In addition, while we do not condone any expression of racial bias, here the comment did not

impermissibly imply that the defendant harbored a prejudice against Black men.

Judgments affirmed.

By the Court (Blake, C.J., Vuono & Neyman, JJ.[2]),

Clerk

Entered:    July 10, 2026.

---

[2] The panelists are listed in order of seniority.